# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUSTIN CRAIG AND ERIC MARTINEZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> TOO LOST LLC, <br><br> Defendant. | Case No.: 1:26-cv-02548 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Justin Craig and Eric Martinez ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendant, Too Lost LLC ("TL" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE ACTION

1. This class action arises out of Defendant's failures to properly secure and safeguard Plaintiffs' and Class Members' sensitive personally identifiable information ("PII" or "Private Information").

2. "At the end of January 2026, Too Lost was contacted by an unauthorized third party" and following an investigation evidence indicated "unauthorized access and transfer of data involving" Too Lost LLC "between July 25, 2025, and September 2, 2025."[1]

3. Defendant's data security failures allowed a targeted cyberattack to compromise Defendant's network (the "Data Breach") that, upon information and belief, contained the Private Information of Plaintiffs and other individuals ("the Class").

---

[1] Exhibit 1 (Plaintiffs' Data Breach Notice Letters).

4.      Too Lost is a music and technology company, providing SaaS solutions for independent music rights holders. Our distribution and publishing services deliver, monetize and protect songs across the globe for over 400,000+ musicians, record labels, studios, brands, investors, and platforms. Too Lost is headquartered in New York, New York.[2]

5.      The Private Information compromised in the Data Breach included Plaintiffs' and Class Members' full names, contact information such as addresses, email addresses, and phone numbers. Upon information and belief, additional data such as payment information, account information, and more was compromised in the data breach.[3]

6.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted.

7.      Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure Private Information from those risks left that property in a dangerous condition.

8.      Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to

---

[2] https://toolost.com/about (last visited March 27, 2026).

[3] https://ago.vermont.gov/document/2026-02-20-too-lost-data-breach-notice-consumer (citing "variable data" beyond the data confirmed to have been compromised); see also Exhibit 1 (Plaintiffs' Data Breach Notice Letters).

warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

9.      Defendant impliedly understood its obligations and promised to safeguard Plaintiffs' and Class Members' Private Information. Plaintiffs and Class Members relied on these implied promises when seeking out and paying for education from Defendant.  But for this mutual understanding, Plaintiffs and Class Members would not have provided Defendant with their Private Information. Defendant, however, did not meet these reasonable expectations, causing Plaintiffs and Class Members to suffer injury.

10.     Defendant disregarded the rights of Plaintiffs and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

11.     In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had it properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Private Information of Plaintiffs and Class Members.

12. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

13. As a result of the Data Breach, Plaintiffs and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their medical and financial accounts to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security practices, Plaintiffs and Class Members have suffered numerous actual and concrete injuries and damages.

14. Plaintiffs and Class Members must now closely monitor their credit scores, financial accounts, and more to guard against future identity theft and fraud. Plaintiffs and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

15. Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (g) deprivation of value of their Private Information; and (h) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it

collected and maintained.

16.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of all similarly situated individuals whose Private Information was compromised and/or stolen during the Data Breach.

17.     Accordingly, Plaintiffs brings this action against Defendant seeking redress for its unlawful conduct and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, (iii) unjust enrichment, and (iv) declaratory relief.

18.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

19.     The exposure of one's Private Information to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiffs' and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## PARTIES

20.     Plaintiff Justin Craig is an adult individual who at all relevant times has been a citizen and resident of Palatine, Illinois.

21.     Plaintiff Eric Martinez is an adult individual who at all relevant times has been a citizen and resident of Round Lake Beach, Illinois.

22.     Defendant Too Lost LLC is a for-profit enterprise with its headquarters and principal place of business located in New York, New York. Defendant "is a music and technology company, providing SaaS solutions for independent music rights holders."[4]

---

[4] https://toolost.com/about/

## JURISDICTION AND VENUE

23.     This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and Class Members are citizens of states that differ from Defendant.

24.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this district, conducts business in, and has sufficient minimum contacts with New York.

25.     Venue is likewise proper as to Defendant in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this District and many of Defendant's acts complained of herein occurred within this District.

## FACTUAL BACKGROUND

**A.      Defendant Knew the Risks of Storing Valuable Private Information and the Foreseeable Harm to Victims.**

26.     At all relevant times, Defendant knew it was storing valuable and confidential Private Information on Defendant's systems and would, therefore, be an attractive target for cybercriminals.

27.     Defendant also knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

28.     These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

6

29.    The Private Information stolen in the Data Breach has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[5]

30.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S.

31.    Data breaches, including those perpetrated against educational institutions that store PII in their systems, have become widespread.

32.    Defendant's data security obligations were particularly important given the substantial increase in data breaches targeting educational institutions that collect and store PII, like Defendant, preceding the Data Breach.

33.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's current and former customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

34.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[6]

---

[5] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/

[6] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf

35.     Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained Private Information about the individual, such as names, addresses, email addresses, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.[7]

**B.     Defendant Breached its Duty to Protect its Current and Former Customers' Private Information.**

36.     Upon information and belief, Defendant's Privacy Policy is made available to every customer.[8]

37.     Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Under state and federal law, companies like Defendant have duties to protect their customers' Private Information and to notify them about breaches.

38.     The Private Information held by Defendant in its computer system and network included the highly sensitive Private Information of Plaintiffs and Class Members.

---

[7] See https://www.threatlocker.com/blog/why-businesses-must-prevent-their-data-from-fueling-fullz-packages ("Allowing your data to end up in a Fullz package doesn't just create liability. It enables identity theft, damages lives, and leaves a permanent stain on your organization's reputation. And once it happens the first time, you become a target for more.").
[8] *See* https://toolost.com/privacy-policy

39.     From July 25, 2025 to at least September 2, 2025, an unauthorized party accessed and transferred data involving Too Lost LLC customers. Too Lost did not know of the unauthorized access until around the end of January 2026, when the unauthorized third party contacted Too Lost LLC to inform them they obtained confidential Private Information of its customers. The Company's investigation concluded around February 10, 2026, and confirmed that customer's personal information was impacted by the unauthorized third party gaining access and exfiltrating the Private Information.[9]

40.     Defendant had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

41.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

42.     The attacker accessed and acquired files containing unencrypted PII of Plaintiffs and Class Members. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

**C.     Plaintiffs and Class Members Suffered Damages.**

43.     For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and Class Members must immediately devote time, energy, and money to:

---

[9] *See* https://ago.vermont.gov/document/2026-02-20-too-lost-data-breach-notice-consumer (citing "variable data" beyond the data confirmed to have been compromised); see also Exhibit 1 (Plaintiffs' Data Breach Notice Letters).

1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

44.     Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' Private Information has been diminished by its exposure in the Data Breach.

45.     As a result of Defendant's failures, Plaintiffs and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

46.     Plaintiffs and the Class Members have been injured by Defendant's unauthorized disclosure of their confidential Private Information.

47.     Plaintiffs and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attacks so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its current and former customers' and applicants' Private Information.

## COMMON INJURIES AND DAMAGES

48.     As result of Defendant's ineffective and inadequate data security practices, Plaintiffs and Class Members now face a present and ongoing risk of fraud and identity theft.

49.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including but not limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution in value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

**A.    The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing**

50.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

51.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

52.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

53.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[10] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[11] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

54.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[12] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical

---

[10] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/

[11] *Id.*

[12] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Nov. 21, 2024).

delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[13] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[14]

55.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[15]

56.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

57.     Even then, a new Social Security number may not be effective, as "[t]he credit

---

[13] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/

[14] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web

[15] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf

bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

58.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[17]

59.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[18]

60.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[19] Defendant did not rapidly report to Plaintiffs and the Class that their Private Information had been stolen. Even worse, Defendant has still not notified affected individuals of the Data Breach.

61.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment

---

[16] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft

[17] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf

[18] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120

[19] *Id.*

14

in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

62.    In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

63.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

64.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[20]

65.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only

---

[20] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf

as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[21]

66.    According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[22]

67.    Defendant's failure to notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

**B.    Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

68.    As a result of the recognized risk of identity theft, when a data breach occurs, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

---

[21]    *See    generally*    https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

[22]    *See, e.g.,*    https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices

69.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

70.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[23]



71.     In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding

---

[23]    "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.

data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[25]

**C.      Diminution in Value of the Private Information Stolen in the Data Breach**

72.      Private Information is a valuable property right.[26] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

73.      Private Information can sell for as much as $363 per record according to the Infosec Institute.[27]

74.      An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[28] In fact, the data marketplace

---

[24] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[25] *See* https://www.identitytheft.gov/Steps

[26] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[27] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[28] *See* https://www.latimes.com/business/story/2019-11-05/column-data-brokers

is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29, 30] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[31]

75.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

**D.     Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

76.     To date, Defendant has **nothing** to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach.

77.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

78.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file

---

[29] *See* https://datacoup.com/

[30] *See* https://digi.me/what-is-digime/

[31]  Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

79.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[32] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

80.     Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

81.     The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**E.     Loss of Benefit of the Bargain**

82.     Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to provide their Private Information, which was a condition precedent to obtain education, Plaintiffs as a consumer understand and expected that they were, in part, paying for services and data security to protect the Private Information required to be collected from him.

83.     In fact, Defendant did not provide the expected data security. Accordingly,

---

[32] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1

Plaintiffs and Class Members received services that were of a lesser value than what he reasonably expected to receive under the bargains struck with Defendant.

**F.    Injunctive Relief is Necessary to Protect Against Future Data Breaches**

84.    Moreover, Plaintiffs and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

85.    Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, Plaintiffs and Class Members suffered or are at an increased risk of suffering:

    a.  loss of the opportunity to control how their Private Information is used;

    b.  diminution in value of their Private Information;

    c.  compromise and continuing publication of their Private Information;

    d.  out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

    e.  lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.  delay in receipt of tax refund monies;

    g.  unauthorized use of their stolen Private Information; and

    h.  continued risk to their Private Information —which remains in Defendant's

21

possession—and is thus at risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

**G.      Lack of Compensation**

86.     Defendant fails to compensate victims of the Data Breach at all, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

87.     Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

88.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

89.     Further, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

90.     Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

91. In addition, Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the property of loss of value damages in related cases.

92. Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

93. Defendant's delay in identifying and reporting the Data Breach is causing

23

additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach and has not notified Plaintiffs and Class Members of the details of the Data Breach. They have yet to offer an explanation for the delay. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiffs and Class.

## PLAINTIFF JUSTIN CRAIG' EXPERIENCE

94.     Plaintiff Justin Craig is and at all times mentioned herein was an adult individual and a natural person residing in Palatine, Illinois where he intends to remain.

95.     Plaintiff provided his Private Information to Defendant as a condition of being a customer of TL.

96.     Plaintiff only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use at least adequate basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases that stored his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

97.     Plaintiff is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

98.     Plaintiff entrusted his Private Information and other confidential information to Defendant with the reasonable expectation and understanding that Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to his Private Information.

99. Plaintiff would not have allowed Defendant to collect and maintain his Private Information had he known that Defendant would not take reasonable steps to safeguard his Private Information.

100. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

101. Plaintiff has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

102. The Data Breach has caused Plaintiff to suffer imminent and impending injury in the form of substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

103. As a result of the actual harm suffered and the increased imminent risk of future harm, Plaintiff has spent time and effort checking his accounts and otherwise mitigating the harmful effects of the Data Breach.

104. In addition, Plaintiff has spent significant time dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring his own accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was incurred as a result of the Data Breach.

105. The substantial risk of imminent harm and loss of privacy have both caused Plaintiff to suffer stress, fear, and anxiety, especially the indefinite prospect of Plaintiffs' Private

Information being available to third parties for the rest of his life.

106. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

107. Following the Data Breach, Plaintiff has experienced a noticeable and appreciable increase in the number and frequency of his receiving "spam" e-mails, text messages, and/or phone calls which are harassing each day.

## PLAINTIFF ERIC MARTINEZ'S EXPERIENCE

108. Plaintiff Eric Martinez is and at all times mentioned herein was an adult individual and a natural person residing in Round Lake Beach, Illinois where he intends to remain.

109. Plaintiff provided his Private Information to Defendant as a condition of being a customer of TL.

110. Plaintiff only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use at least adequate basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases that stored his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

111. Plaintiff is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

112. Plaintiff entrusted his Private Information and other confidential information to Defendant with the reasonable expectation and understanding that Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related

to his Private Information.

113. Plaintiff would not have allowed Defendant to collect and maintain his Private Information had he known that Defendant would not take reasonable steps to safeguard his Private Information.

114. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

115. Plaintiff has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

116. The Data Breach has caused Plaintiff to suffer imminent and impending injury in the form of substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

117. As a result of the actual harm suffered and the increased imminent risk of future harm, Plaintiff has spent time and effort checking his accounts and otherwise mitigating the harmful effects of the Data Breach.

118. In addition, Plaintiff has spent significant time dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring his own accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was incurred as a result of the Data Breach.

119. The substantial risk of imminent harm and loss of privacy have both caused Plaintiff

to suffer stress, fear, and anxiety, especially the indefinite prospect of Plaintiffs' Private Information being available to third parties for the rest of his life.

120.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

121.    Following the Data Breach, Plaintiff has experienced a noticeable and appreciable increase in the number and frequency of his receiving "spam" e-mails, text messages, and/or phone calls which are harassing each day.

## CLASS ALLEGATIONS

122.    Plaintiffs bring this case individually and, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Class:

> All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach discovered by Defendant in January 2026 (the "Class").

123.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

124.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

125.    **Numerosity.**    The class described above is so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. It is believed the class size consists of over 3 million class members. The exact size of the

Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach.

126.    **Commonality.**  This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a.    Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.    Whether Defendant had a duty to maintain the confidentiality of Plaintiffs and Class Members' Private Information;

c.    Whether Defendant was negligent in collecting, storing and safeguarding Plaintiffs' and Class Members' Private Information, and breached its duties thereby;

d.    Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

e.    Whether Plaintiffs and Class Members are entitled to restitution or disgorgement as a result of Defendant's wrongful conduct; and

f.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

127.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class Members.  The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard Private Information.  Plaintiffs and Class Members were all current and former customers of Defendant, each having their Private Information obtained by an unauthorized third party.

128.    **Adequacy of Representation.**  Plaintiffs is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members he seeks to

represent; Plaintiffs has retained counsel competent and experienced in complex class action litigation; Plaintiffs intends to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.  Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

129.    **Predominance.**   Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its common law and statutory duties to secure Private Information on its network server, then Plaintiffs and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

130.    **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

131.    **Manageability.** The precise size of the Class is unknown without the disclosure of Defendant's records.  The claims of Plaintiffs and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiffs and the Class.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

132.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

133.   Defendant owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

134.   Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

135.   Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

136.   Defendant breached the duties owed to Plaintiffs and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to follow its own privacy policies and practices published to its current and former customers.

137.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised and/or stolen.

138.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

139.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect the Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its customers and applicants.

140.    Plaintiffs and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

141.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

142.    The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

143.    Defendant violated its own policies not to use or disclose Private Information without written authorization.

144.    Defendant violated its own policies by actively disclosing Plaintiffs' and the Class Members' Private Information; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to maintain the confidentiality of Plaintiffs' and the Class Members' records;

32

and by failing to provide timely notice of the breach of Private Information to Plaintiffs and the Class.

145.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered injuries, including:

    a.   Theft of their Private Information;

    b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.   Costs associated with purchasing credit monitoring and identity theft protection services;

    d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

    g.   Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would

safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

i. Loss of their privacy and confidentiality in their Private Information;

j. The erosion of the essential and confidential relationship between Defendant – as a educational provider – and Plaintiffs and Class Members as customers and applicants; and

k. Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

146. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

147. Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

148. When Plaintiffs and members of the Class provided their personal information to Defendant, Plaintiffs and members of the Class entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their data had been breached and compromised.

149.    Defendant required Plaintiffs and Class Members to provide and entrust their Private Information as a condition of obtaining employment and/or services from Defendant.

150.    Plaintiffs and Class Members would not have provided and entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant.

151.    Plaintiffs and members of the Class fully performed their obligations under the implied contracts with Defendant.

152.    Defendant breached the implied contracts it made with Plaintiffs and Class Members by failing to safeguard and protect the Private Information of Plaintiffs and members of the Class and by failing to provide timely notice to them that their Private Information was compromised in and as a result of the Data Breach.

153.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

154.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

155.    This count is brought in the alternative to Plaintiffs' breach of implied contract count.  If claims for breach of contract are ultimately successful, this count will be dismissed.

156.    Plaintiffs and Class Members conferred a benefit on Defendant by way of customers and applicants paying Defendant to maintain Plaintiffs' and Class Members' Private Information.

157.	The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and Class Members.

158.	Defendant failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiffs and Class Members, and as a result Defendant was overpaid.

159.	Under principles of equity and good conscience, Defendant should not be permitted to retain the money because Defendant failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class Members' Private Information that they paid for but did not receive.

160.	Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

161.	Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

162.	As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Class)**

163.	Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

164.	This Court is authorized to declare rights, status, and other legal relations, and such declarations shall have the force and effect of a final judgment or decree. Furthermore, the Court

has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

165.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information. Plaintiffs alleges that Defendant's data security measures remain inadequate, contrary to Defendant's assertion that it has confirmed the security of its network. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of Private Information and remains at imminent risk that further compromises of Private Information will occur in the future.

166.   Pursuant to its authority, this Court should enter a judgment declaring, among other things, the following:

a.   Defendant owes a legal duty to secure Private Information and to timely notify customers, applicants, or any individuals impacted by the Data Breach under the common law, Section 5 of the FTC Act, HIPAA, various state statutes, and the common law; and

b.   Defendant continues to breach this legal duty by failing to employ reasonable measures to secure current and former customers' Private Information.

167.   This Court also should issue corresponding prospective injunctive relief requiring Defendant to, at minimum 1) disclose, expeditiously, the full nature of the Data Breach, including when the Data Breach occurred, and the types of Private Information accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of Plaintiffs' and Class Members' Private Information possessed by Defendant;

and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

168.   If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

169.   The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

170.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and Class Members whose confidential information would be further compromised.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of himself and all other similarly situated, pray for relief as follows:

a. For an order certifying the Class under Federal Rule of Civil Procedure 23 and naming Plaintiffs as the representative of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

b. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

c. For compensatory, statutory, treble, and/or punitive damages in amounts to be determined by the trier of fact;

d. For an order of restitution, disgorgement, and all other forms of equitable monetary relief;

e. Declaratory and injunctive relief as described herein;

f. Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

g. Awarding pre- and post-judgment interest on any amounts awarded; and

h. Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: March 27, 2026

Respectfully Submitted,

*/s/ William B. Federman*
William B. Federman
Jonathan J. Herrera (*pro hac vice* forthcoming)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
4131 North Central Expressway, Suite 900
Dallas, Texas 75204
wbf@federmanlaw.com
jjh@federmanlaw.com

*Counsel for Plaintiffs and the Putative Class*